# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| iPhone XR, assigned call number 714-697-1964, bearing serial number DX3DG6HXKXL0 | ) ) ) |

Case No.  8:21-MJ-00709

## APPLICATION FOR A SEARCH WARRANT BY TELEPHONE

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-2

located in the _____Central_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 231(a)(3), 18 U.S.C. § 1512(c), and 18 U.S.C. § 1752(a)(1) and (2) | See attached Affidavit |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Kellie Martin, Special Agent, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state:  Santa Ana, California

Hon. Karen E. Scott, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Benet J. Kearney, (212) 637-2260

## AFFIDAVIT

I, Kellie Martin, being duly sworn, declare and state as follows:

### I. INTRODUCTION

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since November 2018.  I am currently  assigned to the Domestic Terrorism Squad in the San Francisco Division Office, Oakland Resident Agency. I successfully completed 21 weeks of New Agent Training at the FBI Academy in February 2019. During that time, I was trained in federal investigations, to include domestic terrorism investigations. I am assigned to investigate domestic terrorism cases, racially motivated violent crimes, and anti-government crimes. As an FBI agent, I am authorized to investigate violations of United States law and am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C).

2.    I am one of the investigators assigned to an ongoing investigation by the FBI, United States Capitol Police ("USCP"), Metropolitan Police Department ("MPD"), and other law enforcement agencies, of riots and civil disorder that occurred on January 6, 2021, in and around the United States Capitol grounds. Since I became involved in this investigation on January 6, 2021, I have conducted interviews, reviewed public tips, reviewed publicly available photos and video, and reviewed relevant documents, among other things.

## II. <u>PURPOSE OF AFFIDAVIT</u>

3.   This affidavit is made in support of warrants to search: (1) a grey 2007 Toyota Corolla, with VIN 1NXBR32E57Z817567, bearing California license plate number 5XXP740 on the front plate and Arizona license plate number S0A7CTA on the rear plate(the "SUBJECT VEHICLE"), as described more fully in Attachment A-1, which is incorporated herein by reference; and (2) an iPhone XR, assigned call number 714-697-1964, with serial number DX3DG6HXKXL0 (the "SUBJECT DEVICE"), as described more fully in Attachment A-2, which is incorporated herein by reference; for evidence, fruits, and instrumentalities of violations of the following statutes, as described more fully in Attachment B, which is also incorporated herein by reference: 18 U.S.C. § 231(a)(3) (Civil Disorder); 18 U.S.C. § 1512(c) (Obstruction of an Official Proceeding); and 18 U.S.C. § 1752(a)(1) and (2) (Restricted Buildings or Grounds) (collectively, the "Subject Offenses").

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only and all dates and times are approximate.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

5.    On January 6, 2021, KIM MICHAEL SORGENTE (the "TARGET SUBJECT" or "SORGENTE") was part of a violent mob that rioted at the United States Capitol in Washington D.C. while a joint session of Congress met to certify the results of the 2020 Presidential Election.  SORGENTE was captured in U.S. Capitol CCTV camera footage, the body-worn camera ("BWC") footage of MPD officers who responded to the Capitol on January 6, 2021, and other publicly available video and images on the Capitol grounds, including  inside the Lower West Terrace tunnel (the "Tunnel") of the Capitol building on January 6, 2021.  This footage shows, among other things, SORGENTE near the front of the crowd of rioters in the Tunnel, participating in coordinating pushing and rocking officers in the Tunnel.

6.    On October 21, 2021, the Honorable Robin M. Meriweather, United States Magistrate Judge in the District of Columbia, issued a criminal complaint and arrest warrant charging SORGENTE with violations of 18 U.S.C. § 231(a)(3) (Civil Disorder) and 18 U.S.C. § 1752(a)(1) and (2) (Restricted Buildings or Grounds).  The criminal complaint, arrest warrant, and affidavit in support thereof are attached hereto as Exhibit A and incorporated herein by reference.

7.    As detailed below, there is probable cause to believe that SORGENTE drives the SUBJECT VEHICLE, that SORGENTE uses the SUBJECT DEVICE, and that additional evidence of the Subject Offenses – including items and digital device(s) used by

SORGENTE during the riot at the U.S. Capitol – will be found inside the SUBJECT VEHICLE and on the SUBJECT DEVICE.

### IV.   STATEMENT OF PROBABLE CAUSE

**A.   The TARGET SUBJECT**

8.   On March 15, 2021, the FBI Washington Field Office ("WFO") opened a file on an unknown male subject who would later be identified as KIM MICHAEL SORGENTE.   WFO posted to the Internet a "Be on the Lookout" ("BOLO") for the individual depicted below (at the time referred to "263-AFO"):

   

*BOLO 263-AFO A*                    *BOLO 263-AFO B*

9.   Based on my review of publicly available video footage and still images, USCP surveillance footage, and body worn camera ("BWC") footage of officers that responded to the Capitol on January 6, 2021, I have observed that, at various points on January 6, 2021, SORGENTE was wearing a red "Make America Great

Again" baseball hat,[1] sunglasses, a gray zip-up hooded sweatshirt, a black t-shirt with the words "Deus Vult" and what appears to be religious iconography printed on it, and blue jeans.  He also at times carried a white megaphone and a cellphone in a distinctive light pink or beige protective case with what appears to be eyes and a beak printed on it, as depicted below.



On January 6, 2021, SORGENTE also had distinctive facial hair – a goatee and mustache – as depicted in the images in paragraph 8.

    10.  On April 1, 2021, an FBI agent ("Agent-1") provided the two images in paragraph 8 above, as well as a video depicting 263-AFO to a detective with the Santa Ana (California) Police Department ("Detective-1"), a still image from which is below:

---

[1] As discussed further in paragraphs 13-17, SORGENTE was filmed and/or photographed wearing at least two different red "Make America Great Again" baseball hats on January 6, 2021.  Prior to 3:00 p.m., SORGENTE was wearing hat with a gold leaf decoration on the brim, an American flag on each side, and three gold stars on the back.  After 3:26 p.m., SORGENTE was wearing a red "Make America Great Again" baseball hat that did not have any gold decoration.



Detective-1 had previously arrested and interviewed SORGENTE on
March 23, 2021, in connection with events that occurred in
December 2020, and identified 263-AFO as SORGENTE.[2]  In
connection with that arrest, SORGENTE provided a particular
phone number (the "Sorgente Phone Number").  Detective-1 had
also called SORGENTE using the Sorgente Phone Number on January
4, 2021.

    11.  I have also reviewed a California Department of Motor
Vehicles photograph of SORGENTE.  Based on that review, I
believe that SORGENTE is 263-AFO.

    12.  According to records obtained through a search warrant
which was served on Verizon Wireless, on January 6, 2021, the

---

[2] The FBI received at least two tips that identified 263-AFO as
someone other than SORGENTE.  However, upon reviewing these
tips, the FBI concluded that the individual identified did not
match AFO-263 in appearance.

Sorgente Phone Number was identified as having utilized a cell site consistent with providing service to a geographic area that includes the immediate vicinity and/or interior of the United States Capitol building.

    **B.**   **The TARGET SUBJECT's Conduct on January 6, 2021**

        **1.**   **1:36 p.m.**

13.  Based on my review of BWC footage and publicly available images, I have observed the following:

    a.  By at least 1:34 p.m. on January 6, 2021, numerous rioters were at the police line protecting the west side of the Capitol, with metal bike-rack barricades separating the crowd and the police officers.  At approximately 1:35 p.m., the crowd of rioters was pushing against the barricades, lifting them off of the ground, and police officers were attempting to maintain them.

    b.  At approximately 1:36 p.m., the officers succeeded in bringing the barricades back down onto the ground, causing several rioters to fall down and/or backwards.  SORGENTE emerged from the crowd, wearing a black gaiter across his face and holding a megaphone and a cellphone.  SORGENTE stumbled backwards then raised the megaphone towards his face and shouted into the megaphone at the officers, "How dare you?  How dare you, traitors?  How dare you traitors?" as depicted below:



      c.   In the images above, SORGENTE also appears to be filming with a cellphone.

**2.   2:04 p.m.**

14.  Based on my review of BWC footage and other publicly available video,  I have observed the following:

a.   At approximately 2:04 p.m. on January 6, 2021, SORGENTE was present near the base of the inauguration scaffolding erected on the north side of the West Plaza of the Capitol.  At that time, a recording was played over a loudspeaker, which stated: "All people must leave the area immediately.  Failure to comply with this order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon. . . This area is now a restricted access area."

b.   As police officers moved through the area, they were assaulted by other rioters.  As the officers attempted to control and push back the rioters, SORGENTE, using a megaphone, shouted at the officers "What are you doing?  What are you doing? How does it feel to be a traitor?  How does it feel to be a traitor? What the fuck do you think you're doing?"  SORGENTE's position is depicted in the images below:





      c.   In the images above, SORGENTE also appears to be filming with a cellphone.

### 3.   2:40 – 3:03 p.m.

15.   Based on my review of BWC footage, U.S. Capitol surveillance video, and other publicly available video, I have observed the following:

a.   By approximately 2:40 p.m. on January 6, 2021, SORGENTE relocated to the vicinity of the terrace on the west side of the Capitol building where a stage for the Presidential Inauguration was being constructed – the Lower West Terrace and positioned himself close to the arched entrance to a passageway that connects the Lower West Terrace and the interior of the U.S. Capitol building (the "Archway" and the "Tunnel," respectively).

b.   At approximately, 2:40 p.m., police officers entered the Tunnel and began to form a protective line with riot shields behind a set of glass inside of the Tunnel .  Soon thereafter, numerous rioters entered the Tunnel.  At approximately 2:41 p.m., SORGENTE, holding a cellphone, walked through the Archway and entered the Tunnel, as depicted below:



     c.   SORGENTE then turned around, walked back towards the Archway, and, at approximately 2:42 p.m., exited the Tunnel.

     d.   At approximately 2:54 p.m. SORGENTE again entered the Tunnel, and moved towards the interior of the Capitol building, as depicted below:



e.   Between approximately 2:54 p.m. and 2:55 p.m., at
the same time that SORGENTE was in the Tunnel, several other
rioters made their way out of the Tunnel and exited the Capitol
building.  SORGENTE appeared to offer water to several exiting
rioters as they left.

f.   Between at least 2:54 p.m. and 3:00 p.m.,
rioters, including SORGENTE, collectively pushed against the
officers – at times rocking together in a coordinated fashion –
in an effort to breach the line of officers and gain entry to
the interior of the Capitol building.  Several rioters threw
objects at the officers and used poles to strike at the
officers.  SORGENTE's position within the crowd is depicted in
the images below:









g.   At approximately 2:57 p.m., a woman who was positioned at the front of the crowd of rioters, immediately in front of police officers, retreated from the front of the crowd

and repositioned herself closer to the Archway.  At the same time, numerous other rioters exited the Tunnel entirely.

h.   By approximately 3:01 p.m., SORGENTE was positioned closer to the Archway, and appeared to wash his eyes out with water,[3] as depicted below:



i.   At approximately 3:03 p.m., SORGENTE exited the Tunnel.

**4.   3:26 – 4:00 p.m.**

16.   Based on my review of BWC footage and U.S. Capitol surveillance video, I have observed the following:

a.   SORGENTE returned to the Archway by approximately 3:26 p.m., and positioned himself just outside of the Tunnel, on

_____

[3] Police officers and rioters deployed crowd-control spray and other lachrymal agents in the Tunnel.  I therefore believe that SORGENTE was attempting to wash these substances out of his eyes.

the south side of the Archway.  SORGENTE remained in approximately
that position for at least 44 minutes, until at least 4:00 p.m.[4]
SORGENTE's approximate position is depicted in the image below:



A closer view of SORGENTE's face was captured by the BWC of MPD
officers positioned in the Archway, for example, the images
below:

---

[4] During this time, SORGENTE made statements directed at the
officers in the Archway such as "We're not gonna hurt you at
all.  We're not gonna hurt any of you.  But you hurt us.  And
you're hurting the country, if you don't stop" and "Why don't
you let us in? Let us in.  It's our house.  It's our house.
You let us in, we'll behave.  If you keep fighting us and pepper
spraying us, we're gonna get upset."

 

b.   At approximately 3:48, the crowd, including SORGENTE, began to collectively push against the line of police officers in the Archway, in an effort to force entry into the Tunnel.   SORGENTE's position is depicted in the images below:





c.   At approximately 3:50 p.m., the crowd of rioters, including SORGENTE, again collectively pressed against the line of police officers in the Archway, and moved back and forth in a coordinated manner, in an attempt to break through the line of officers and enter the Tunnel, as depicted below:





### 5.   4:24 – 4:26 p.m.

17.   Based on my review of BWC footage,  U.S. Capitol surveillance video, and other publicly available video, I have observed the following:

a.   By approximately 4:24 p.m., officers were attempting to expel the rioters from the Archway.  SORGENTE was positioned in the Archway, directly in front of the officers, as depicted below:



As the officers tried to push him out of the Archway, SORGENTE yelled "Oh god, don't do it.  Oh my god, you hurt me bad! Please!  Please!  Ah, I got hit in the head.  I'm bleeding now."

b.   Officers continued to push SORGENTE out of the Archway for more than a minute.[5]  Although there appears to have

---

[5] During this time, at approximately 4:25 p.m., at least two
*(footnote cont'd on next page)*

been space in front of SORGENTE for him to move into, as
depicted below, SORGENTE, with his back to the officers, leaned
back and pushed his weight into the officers.



riocters were in medical distress and a member of the crowd was
pleading with officers and others for help, as his friend was
dying after being trampled by the mob.  SORGENTE, apparently in
response, yelled "Get her up.  Get her up, please.  Save her
life.  Save her life."



  c. By approximately 4:26 p.m., officers succeeded in pushing SORGENTE out of the Archway.  SORGENTE, holding a strobing flashlight, stumbled, then got up, rinsed his eyes with water, and walked away from the Archway.

  **6. 4:46 p.m.**

18. Based on my review of BWC footage,  U.S. Capitol surveillance video, and other publicly available video, I have observed the following:

  a. At approximately 4:46 p.m., SORGENTE returned to the Archway and positioned himself at the middle of the Archway, as depicted below:



     b.   Rioters positioned in front of SORGENTE, closer to the line of police officers in the Archway, were holding riot shields, and began to slam the line of officers using those shields.

     c.   After a few seconds, SORGENTE joined in by positioning himself behind one of the rioters holding a riot shield and propelling that rioter forward into the line of police officers, as depicted below:





25

C.    **The SUBJECT VEHICLE**

19.  According to a search of law enforcement databases, a grey 2007 Toyota Corolla, with VIN 1NXBR32E57Z817567, and California license plate number 5XXP740 is registered in the names KIM MICHAEL SORGENTE – the TARGET SUBJECT – and MICHELE SORGENTE – whom I know to be SORGENTE's deceased father.

20.  On June 7, 2021, I interviewed a witness ("Witness-1") who has known SORGENTE since at least 2018.  Witness-1 reported that SORGENTE traveled frequently to attend protests and rallies, often in Orange County, California, and stayed off-and-on with Witness-1 when he was in Pleasanton.  Witness-1 suspected that he "couch-surfed" – that is, stayed with other individuals for short periods of time – when he was not staying with Witness-1.

21.  On July 13, 2021, FBI Agents conducted surveillance outside a building in Santa Ana, California where the Orange County Board of Supervisors ("OCBOS") was meeting (the "Building").  SORGENTE was present at that meeting.

22.  At approximately 9:25 a.m., an FBI Agent ("Agent-2") observed the SUBJECT VEHICLE parked near the Building.  At approximately 9:35 a.m., Agent-2 observed SORGENTE enter the driver's side of the SUBJECT VEHICLE and drive away.

23.  At approximately 9:50 a.m., an FBI Agent ("Agent-3") observed SORGENTE return to the Building and resume attending the OCBOS meeting.  At approximately 12:20 p.m., Agent-3 observed SORGENTE walking around the courtyard outside of the Building.

24.   At approximately 1:00 p.m., Agent-2 observed that the SUBJECT VEHICLE was parked in a parking lot.   Agent-2 observed SORGENTE enter the driver's side of the SUBJECT VEHICLE and driver out of the parking lot.

25.   Between approximately 1:12 p.m. and 1:40 p.m., FBI agents, including Agent-2, observed SORGENTE driving the SUBJECT VEHICLE and making various stops, before parking in front of a residence, which SORGENTE entered, using a key.

**D.   THE SUBJECT DEVICE**

26.   As described in paragraphs 13(b)-(c), 14(c), and 15(b), based on my review of BWC, U.S. Capitol surveillance video, and other publicly available video and photographs, I have observed that, on January 6, 2021, SORGENTE was carrying a cellphone while on the Capitol grounds, and at times appeared to be filming with it.

27.   As discussed in paragraph 10, in connection with his March 23, 2021 arrest, SORGENTE provided the Sorgente Phone Number and Detective-1 had previously contacted SORGENTE using the Sorgente Phone Number on January 4, 2021.

28.   As discussed in paragraph 12, according to records obtained through a search warrant which was served on Verizon Wireless, on January 6, 2021, the Sorgente Phone Number was identified as having utilized a cell site consistent with providing service to a geographic area that includes the immediate vicinity and/or interior of the United States Capitol building.

29.   Based on my review of records obtained from Verizon Wireless, I have learned that, from at least March 2020 until at least August 2021, the subscriber of the Sorgente Phone Number was SORGENTE's wife.

30.   Based on my review of records obtain from Apple, I have learned that, from at least November 2019 until at least August 2021, both the Sorgente Phone Number and the serial number of the Device have associated with an iCloud account in SORGENTE's name.

31.   I therefore believe that the Device is SORGENTE's personal cellphone.

32.   Based on my training and experience, I know that individuals traveling outside of their cities of residence to attend large events, such as the demonstration on January 6, 2021 in Washington D.C., typically carry their cell phones with them in order to coordinate their travel plans, use web-based applications to get directions to unfamiliar locations, and communicate with friends and family both at the event and at home.  Furthermore, based on my training and experience, I know that persons who engage in the Subject Offenses will frequently use digital devices, including cell phones, computers, tablets, and other devices, to conduct their criminal activities, take (and store) photographs and videos in order to memorialize their illegal activities, and maintain contact with others involved with the planning, targeting, and execution of the Subject Offenses.

33.   Indeed, as described in paragraphs 13(b)-(c), 14(c), and 15(b), based on my review of BWC, U.S. Capitol surveillance video, and other publicly available video and photographs, I have observed that, on January 6, 2021, SORGENTE was carrying a cellphone while on the Capitol grounds, and at times appeared to be filming with it.  I therefore believe that digital devices used by SORGENTE, including the SUBJECT DEVICE, are likely to contain evidence regarding SORGENTE and other's participation in the events at the Capitol on January 6, 2021, including photographs and videos, as well as evidence regarding SORGENTE's location in the hours and days leading up to and after the Capitol Riots, Internet searches he conducted regarding the riots, and communications with other individuals regarding the riots.

34.   In addition, in my training and experience, it is common for individuals to back up or preserve copies of digital media (such as photos and videos) across multiple devices to prevent loss.  Indeed, some companies provide services that seamlessly sync data across devices, such as Apple devices and the Apple iCloud service.  Thus, there is reason to believe that evidence of the Subject Offenses that originally resided on SORGENTS's cellphone(s) may also be saved to other digital devices.  Moreover, as widely reported in the news media, many individuals committing the Subject Offenses posted videos, photos, and commentary about their participation in the Capitol Riots, essentially bragging about their involvement.  Based on that, there is also probable cause to believe that evidence

29

related to these offenses may have been transferred to and
stored on digital devices beyond the particular digital device
SORGENTE possessed during the riot.

35.  Based on my training and experience, and on
conversations I have had with other law enforcement officers, I
know that some individuals who participate in activities aimed
at disrupting or interfering with governmental and/or law
enforcement operations have been known to use anonymizing
services and/or applications capable of encrypting
communications to protect their identity and communications.  By
using such tools, in some cases, the only way to see the content
of these conversations is on the electronic device that had been
used to send or receive the communications.  Indeed, based on my
review of the contents of a cellphone used by an individual who
was in contact with SORGENTE, I know that, in December 2020,
SORGENTE used Telegram – an encrypted messaging application – to
communicate with others.

36.  Based on my training and experience, I know that
individuals typically store their digital devices, such as cell
phones, tablets, and computers, at their personal residences,
vehicles, and/or on their persons, where the devices can be
easily accessed and used.

37.  On or about March 23, 2021, SORGENTE was arrested by
Detective-1 and charged with two counts of assault with a deadly
weapon other than a firearm, in connection with a violent
protest that occurred in Santa Ana, California on December 6,
2020.  Specifically, SORGENTE was alleged to have hit an

individual in the crowd of protesters on the head with a megaphone.  I have reviewed video footage of the events, and observed that the megaphone is similar in appearance to the megaphone that SORGENTE was carrying on January 6, 2021.

38.  I have also reviewed video and still images that were publicly posted on the internet of a confrontation at an anti-mask protest at a school in Huntington Beach, California at the end of September 2021, and observed SORGENTE holding a megaphone that is similar in appearance to the megaphone that he was carrying on December 6, 2020 and January 6, 2021.

39.  On January 6, 2021, SORGENTE wore uniquely identifiable clothing, including sunglasses, a gray zip-up hooded sweatshirt, a black t-shirt with the words "Deus Vult." Based on my review of publicly available images and video, I have observed SORGENTE wearing these items on other occasions.

40.  Based on my training and experience, I know that individuals who change location frequently – as I believe SORGENTE does – often keep items that they wish to have ready access to in their vehicles.

41.  Accordingly, I believe that evidence of the Subject Offenses, including digital devices and other items used by SORGENTE to prepare for, commit, document, and discuss the Subject Offenses, are likely to be found on SORGENTE's person and within the SUBJECT VEHICLE.

## V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[6]

42.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remains on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[6] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

   43.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

44.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress KIM MICHAEL SORGENTE's thumbs and/or fingers on the device(s); and (2) hold the device(s) in front of KIM MICHAEL SORGENTE's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

//

//

## VI. <u>CONCLUSION</u>

45.   For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 231(a)(3) (Civil Disorder); 18 U.S.C. § 1512(c) (Obstruction of an Official Proceeding); and 18 U.S.C. § 1752(a)(1) and (2) (Restricted Buildings or Grounds) will be found within the SUBJECT VEHICLE and the SUBJECT DEVICE, as described in Attachments A-1 and A-2.


_____

Kellie Martin
Special Agent, FBI


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 22nd day of
October 2021.


_____

HONORABLE KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A-1**

PROPERTY TO BE SEARCHED

 The SUBJECT VEHICLE is a grey 2007 Toyota Corolla, with VIN 1NXBR32E57Z817567, bearing California license plate number 5XXP740 on the front plate and Arizona license plate number S0A7CTA on the rear plate.

## ATTACHMENT A-2

PROPERTY TO BE SEARCHED

The SUBJECT DEVICE is an iPhone XR, assigned call number 714-697-1964, with serial number DX3DG6HXKXL0.

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are the evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 231(a)(3) (Civil Disorder); 18 U.S.C. § 1512(c) (Obstruction of an Official Proceeding); and 18 U.S.C. § 1752(a)(1) and(2) (Restricted Buildings or Grounds) (collectively, the "Subject Offenses"), namely:

a.   Evidence concerning any plans to unlawfully enter the U.S. Capitol, including any maps or diagrams of the building or its internal offices;

b.   Evidence concerning unlawful entry into the U.S. Capitol, including any property of the U.S. Capitol;

c.   Evidence concerning awareness of the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

d.   Evidence concerning efforts to disrupt the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

e.   Evidence relating to any conspiracy to illegally enter and/or occupy the U.S. Capitol Building on or about January 6, 2021;

f.    Evidence concerning the breach and unlawful entry of the United States Capitol, and any conspiracy or plan to do so, on January 6, 2021;

g.    Evidence concerning the riot and/or civil disorder at the United States Capitol on January 6, 2021;

h.    Evidence concerning the assaults of federal officers/agents and efforts to impede such federal officers/agents in the performance of their duties at the United States Capitol on January 6, 2021;

i.    Evidence concerning damage to, or theft of, property at the United States Capitol on January 6, 2021;

j.    Evidence of any conspiracy, planning, or preparation to commit the Subject Offenses;

k.    Evidence concerning efforts after the fact to conceal evidence of the Subject Offenses, or to flee prosecution for the same;

l.    Evidence concerning materials, devices, or tools that were used to unlawfully enter the U.S. Capitol by deceit or by force, including weapons and elements used to breach the building or to counter efforts by law enforcement, such as pepper spray or smoke grenades;

m.    Evidence of communication devices, including closed circuit radios or walkie-talkies, that could have been

ii

used by co-conspirators to communicate during the unlawful entry into the U.S. Capitol;

n.    Evidence of the state of mind of SORGENTE and/or other co-conspirators, e.g., intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the Subject Offenses and/or the riot and civil disorder that occurred at the United States Capitol on January 6, 2021;

o.    Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation, including the Subject Offenses; or (ii) communicated with the unlawful actors about matters relating to the criminal activity under investigation, including the Subject Offenses, such as records that help reveal their whereabouts;

p.    Records, materials, and information that constitute evidence of identity, including but not limited to:

i.    clothing worn by SORGENTE on January 6, 2021, including a red "Make America Great Again" baseball hat, sunglasses, a gray zip-up hooded sweatshirt, a black t-shirt with the words "Deus Vult" printed on it, and blue jeans;

ii.    items carried by SORGENTE on January 6, 2021, including a white megaphone;

iii

iii. clothing and other articles that reflect evidence of having participated in the unlawful activity at the U.S. Capitol, including evidence of pepper spray or other non-lethal crowd control remnants;

q.   Records and information — including but not limited to documents, communications, e-mails, online postings, photographs, videos, calendars, itineraries, receipts, and financial statements — relating to:

i.   Any records and/or evidence revealing SORGENTE's presence at the January 6, 2021, Capitol Riots;

ii.  Any physical records, such as receipts for travel, which may serve to prove evidence of travel to or from Washington D.C. from December of 2020 through January of 2021;

iii. SORGENTE's (and others') motive and intent for traveling to the U.S. Capitol on or about January 6, 2021; and

iv.  SORGENTE's (and others') activities in and around Washington, D.C., specifically the U.S. Capitol, on or about January 6, 2021;

r.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof;

s.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.    evidence of the times the device was used;

vi.   evidence of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of the Subject Offenses;

vii. evidence of SORGENTE's use or connection to social media accounts;

viii.    passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

ix.   applications, utility programs, compilers, interpreters, or other software, as well as documentation and

v

manuals, that may be necessary to access the device or to conduct a forensic examination of it;

                x.   records of or information about Internet Protocol addresses used by the device;

                xi.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to

store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to

vii

determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

      c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

      d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

      e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

      f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the

other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.    During the execution of this search warrant, law enforcement is permitted to: (1) depress KIM MICHAEL SORGENTE's thumbs and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of KIM MICHAEL SORGENTE's face with his eyes open to activate the facial-, iris-, or retina-recognition

feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.  The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

# EXHIBIT A

# EXHIBIT A

AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
District of Columbia

| | |
|---|---|
| United States of America<br>v.<br><br>Kim Michael Sorgente<br>DOB: XXXXXX<br><br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>) | Case: 1:21-mj-00634<br>Assigned to: Judge Meriweather, Robin M.<br>Assign Date: 10/21/2021<br>Description: COMPLAINT W/ ARREST WARRANT |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____January 6, 2021_____ in the county of _____ in the

_____ in the District of ___Columbia___ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 231(a)(3) - Obstruction of Law Enforcement During Civil Disorder, | |
| 18 U.S.C. § 1752(a)(1) - Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority, | |
| 18 U.S.C. § 1752(a)(2) - Disorderly and Disruptive Conduct in a Restricted Building. | |

This criminal complaint is based on these facts:

See attached statement of facts.

☒ Continued on the attached sheet.

*Complainant's signature*

Kellie Martin, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1
by telephone.

Date: _____10/21/2021_____

2021.10.21
16:22:52 -04'00'

*Judge's signature*

City and state: _____Washington, D.C._____

Robin M. Meriweather, U.S. Magistrate Judge
*Printed name and title*

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| United States of America<br>v.<br>Kim Michael Sorgente | ) Case: 1:21-mj-00634<br>) Assigned to: Judge Meriweather, Robin M.<br>) Assign Date: 10/21/2021<br>) Description: COMPLAINT W/ ARREST WARRANT<br>)<br>)<br>) |

*Defendant*

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*                       Kim Michael Sorgente                       ,

who is accused of an offense or violation based on the following document filed with the court:

❑ Indictment     ❑ Superseding Indictment     ❑ Information     ❑ Superseding Information     ☒ Complaint
❑ Probation Violation Petition     ❑ Supervised Release Violation Petition     ❑ Violation Notice     ❑ Order of the Court

This offense is briefly described as follows:

 18 U.S.C. § 231(a)(3) - Obstruction of Law Enforcement During Civil Disorder;
18 U.S.C. § 1752(a)(1) - Knowingly Entering or Remaining in any Restricted Building or Grounds Without
Lawful Authority;
18 U.S.C. § 1752(a)(2) - Disorderly and Disruptive Conduct in a Restricted Building.

Date:       10/21/2021                        *Robin M. Meriweather signature*       2021.10.21
                                                                                      16:22:00 -04'00'

*Issuing officer's signature*

City and state:            Washington, D.C.                   Robin M. Meriweather, U.S. Magistrate Judge

*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____<br>at *(city and state)* _____ . |
| Date: _____              _____<br>*Arresting officer's signature* |
|              _____<br>*Printed name and title* |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No: |
| | : | |
| v. | : | VIOLATIONS: |
| | : | |
| KIM MICHAEL SORGENTE, | : | 18 U.S.C. § 231(a)(3) |
| | : | (Civil Disorder) |
| Defendant. | : | |
| | : | 18 U.S.C. § 1752(a)(1) and (2) |
| | : | (Restricted Building or Grounds) |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT
## AND ARREST WARRANT

I, Kellie Martin, being first duly sworn, hereby depose and state as follows:

### PURPOSE OF AFFIDAVIT

1.      I make this affidavit in support of an application for an arrest warrant for KIM

MICHAEL SORGENTE.

### AGENT BACKGROUND

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have

been so employed since 2018. I am currently assigned to the Domestic Terrorism Squad in the San

Francisco Division Office, Oakland Resident Agency. I successfully completed 21 weeks of New

Agent Training at the FBI Academy in February 2019. During that time, I was trained in federal

investigations, to include domestic terrorism investigations. I am assigned to investigate domestic

terrorism cases, racially motivated violent crimes, and anti-government crimes. As an FBI agent, I

am authorized to investigate violations of United States law and am a "federal law enforcement

officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C).

1

3.      I am one of the investigators assigned to an ongoing investigation by the FBI, United States Capitol Police ("USCP"), Metropolitan Police Department ("MPD"), and other law enforcement agencies, of riots and civil disorder that occurred on January 6, 2021, in and around the United States Capitol grounds. Since I became involved in this investigation on January 6, 2021, I have conducted interviews, reviewed public tips, reviewed publicly available photos and video, and reviewed relevant documents, among other things.

4.      The facts in this affidavit come from my review of the evidence, my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## BACKGROUND

5.      The United States Capitol is secured 24 hours a day by security barriers and USCP occupy various posts throughout the grounds. Restrictions around the United States Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the United States Capitol. On January 6, 2021, the exterior plaza of the United States Capitol was also closed to members of the public.

6.      On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, located at First Street SE, in Washington, D. C. During the joint session, elected members of the United States House of Representatives and Senate met in the United

States Capitol to certify the vote count of the Electoral College for the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Michael R. Pence was present and presiding, first in the joint session, and then in the Senate chamber.

7.      As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the United States Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the United States Capitol building and U.S. Capitol Police were present, attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

8.      At such time, the certification proceedings were underway, the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, around 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

9.      Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

3

10.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the United States Capitol building without authority to be there.

## STATEMENT OF FACTS SUPPORTING PROBABLE CAUSE

### A.  The Defendant

11.     On March 15, 2021, the FBI Washington Field Office ("WFO") opened a file on an unknown male subject who would later be identified as KIM MICHAEL SORGENTE.  WFO posted to the Internet a "Be on the Lookout" ("BOLO") for the individual depicted below (at the time referred to "263-AFO"):




*BOLO 263-AFO A*                                    *BOLO 263-AFO B*

12.     Based on my review of publicly available video footage and still images, USCP surveillance footage, and body worn camera ("BWC") footage of officers that responded to the Capitol on January 6, 2021, I have observed that, at various points on January 6, 2021,

4

SORGENTE was wearing a red "Make America Great Again" baseball hat,[1] sunglasses, a gray zip-up hooded sweatshirt, a black t-shirt with the words "Deus Vult" and what appears to be religious iconography printed on it, and blue jeans. He also at times carried a white megaphone and a cellphone in a distinctive light pink or beige protective case with what appears to be eyes and a beak printed on it, as depicted below:



On January 6, 2021, SORGENTE also had distinctive facial hair – a goatee and mustache – as depicted in the images in paragraph 11.

13.     On April 1, 2021, an FBI agent ("Agent-1") provided the two images in paragraph 11 above, as well as a video depicting 263-AFO to a detective with the Santa Ana (California) Police Department ("Detective-1"), a still image from which is below:

---

[1] As discussed further in paragraphs 16-20, SORGENTE was filmed and/or photographed wearing at least two different red "Make America Great Again" baseball hats on January 6, 2021. Prior to 3:00 p.m., SORGENTE was wearing hat with a gold leaf decoration on the brim, an American flag on each side, and three gold stars on the back. After 3:26 p.m., SORGENTE was wearing a red "Make America Great Again" baseball hat that did not have any gold decoration.



Detective-1 had previously arrested and interviewed SORGENTE on March 23, 2021, in connection with events that occurred in December 2020, and identified 263-AFO as SORGENTE.[2] In connection with that arrest, SORGENTE provided a particular telephone number (the "Sorgente Phone Number"). Detective-1 had also called SORGENTE using the Sorgente Phone Number on January 4, 2021.

14.     I have also reviewed a California Department of Motor Vehicles photograph of SORGENTE. Based on that review, I believe that SORGENTE is 263-AFO.

15.     According to records obtained through a search warrant which was served on Verizon Wireless, on January 6, 2021, the Sorgente Phone Number was identified as having

---

[2] The FBI received at least two tips that identified 263-AFO as someone other than SORGENTE. However, upon reviewing these tips, the FBI concluded that the individual identified did not match AFO-263 in appearance.

utilized a cell site consistent with providing service to a geographic area that includes the immediate vicinity and/or interior of the United States Capitol building.

**B.  The Defendant's Conduct on January 6, 2021**

**1.        1:36 p.m.**

16.        Based on my review of BWC footage and publicly available images, I have observed the following:

a.        By at least 1:34 p.m. on January 6, 2021, numerous rioters were at the police line protecting the west side of the Capitol, with metal bike-rack barricades separating the crowd and the police officers.  At approximately 1:35 p.m., the crowd of rioters was pushing against the barricades, lifting them off of the ground, and police officers were attempting to maintain them.

b.        At approximately 1:36 p.m., the officers succeeded in bringing the barricades back down onto the ground, causing several rioters to fall down and/or backwards. SORGENTE emerged from the crowd, wearing a black gaiter across his face and holding a megaphone and a cellphone.  SORGENTE stumbled backwards then raised the megaphone towards his face and shouted into the megaphone at the officers, "How dare you?  How dare you, traitors?  How dare you traitors?" as depicted below:





2.      2:04 p.m.

17.     Based on my review of BWC footage and other publicly available video,[3] I have observed the following:

a.      At approximately 2:04 p.m. on January 6, 2021, SORGENTE was present near the base of the inauguration scaffolding erected on the north side of the West Plaza of the Capitol.  At that time, a recording was played over a loudspeaker, which stated: "All people must leave the area immediately.  Failure to comply with this order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon. . . This area is now a restricted access area."

b.      As police officers moved through the area, they were assaulted by other rioters.  As the officers attempted to control and push back the rioters, SORGENTE, using a megaphone, shouted at the officers "What are you doing?  What are you doing?  How does it feel to be a traitor?  How does it feel to be a traitor?  What the fuck do you think you're doing?" SORGENTE's position is depicted in the images below:

---

[3] Although the caption on one of these videos states that the events depicted occurred at 3:05 p.m., based on my comparison of the video to time stamped BWC footage, I believe the events occurred at approximately 2:04 p.m.





10

**3.     2:40 – 3:03 p.m.**

18.     Based on my review of BWC footage, U.S. Capitol surveillance video, and other publicly available video, I have observed the following:

a.     By approximately 2:40 p.m. on January 6, 2021, SORGENTE relocated to the vicinity of the terrace on the west side of the Capitol building where a stage for the Presidential Inauguration was being constructed (the "Lower West Terrace") and positioned himself close to the arched entrance to a passageway that connects the Lower West Terrace and the interior of the U.S. Capitol building (the "Archway" and the "Tunnel," respectively).

b.     At approximately, 2:40 p.m., police officers entered the Tunnel and began to form a protective line with riot shields behind a set of glass inside of the Tunnel. Soon thereafter, numerous rioters entered the Tunnel. At approximately 2:41 p.m., SORGENTE walked through the Archway and entered the Tunnel, as depicted below:



     c.     SORGENTE then turned around, walked back towards the Archway, and, at approximately 2:42 p.m., exited the Tunnel.

     d.     At approximately 2:54 p.m. SORGENTE again entered the Tunnel, and moved towards the interior of the Capitol building, as depicted below:



Between approximately 2:54 p.m. and 2:55 p.m., at the same time that SORGENTE was in the Tunnel, several other rioters made their way out of the Tunnel and exited the Capitol building. SORGENTE appeared to offer water to several exiting rioters as they left.

     e.     Between at least 2:54 p.m. and 3:00 p.m., rioters, including SORGENTE, collectively pushed against the officers – at times rocking together in a coordinated fashion – in an effort to breach the line of officers and gain entry to the interior of the Capitol building. Several rioters threw objects at the officers and used poles to strike at the officers. SORGENTE's position within the crowd is depicted in the images below:









f.      At approximately 2:57 p.m., a woman who was positioned at the front of the crowd of rioters, immediately in front of police officers, retreated from the front of the crowd and repositioned herself closer to the Archway. At the same time, numerous other rioters exited the Tunnel entirely.

g.      By approximately 3:01 p.m., SORGENTE was positioned closer to the Archway, and appeared to wash his eyes out with water,[4] as depicted below:



h.      At approximately 3:03 p.m., SORGENTE exited the Tunnel.

**4.      3:26 – 4:00 p.m.**

19.      Based on my review of BWC footage and U.S. Capitol surveillance video, I have observed the following:

---

[4] Police officers and rioters deployed crowd-control spray and other lachrymal agents in the Tunnel. I therefore believe that SORGENTE was attempting to wash these substances out of his eyes.

a.      SORGENTE returned to the Archway by approximately 3:26 p.m., and positioned himself just outside of the Tunnel, on the south side of the Archway.  SORGENTE remained in approximately that position for at least 44 minutes, until at least 4:00 p.m.[5] SORGENTE's approximate position is depicted in the image below:



A closer view of SORGENTE's face was captured by the BWC of MPD officers positioned in the Archway, for example, the images below:

---

[5] During this time, SORGENTE made statements directed at the officers in the Archway such as "We're not gonna hurt you at all.  We're not gonna hurt any of you.  But you hurt us.  And you're hurting the country, if you don't stop" and "Why don't you let us in? Let us in.  It's our house.  It's our house.  You let us in, we'll behave.  If you keep fighting us and pepper spraying us, we're gonna get upset."



   b.  At approximately 3:48, the crowd, including SORGENTE, began to collectively push against the line of police officers in the Archway, in an effort to force entry into the Tunnel. SORGENTE's position is depicted in the images below:



17



c.      At approximately 3:50 p.m., the crowd of rioters, including SORGENTE, again collectively pressed against the line of police officers in the Archway, and moved back and forth in a coordinated manner, in an attempt to break through the line of officers and enter the Tunnel, as depicted below:

18





**5.**      **4:24 – 4:26 p.m.**

20.      Based on my review of BWC footage, U.S. Capitol surveillance video, and other

publicly available video, I have observed the following:

a.      By approximately 4:24 p.m., officers were attempting to expel the rioters

from the Archway.  SORGENTE was positioned in the Archway, directly in front of the officers,

as depicted below:



As the officers tried to push him out of the Archway, SORGENTE yelled "Oh god, don't do it.

Oh my god, you hurt me bad!  Please!  Please!  Ah, I got hit in the head.  I'm bleeding now."

b.      Officers continued to push SORGENTE out of the Archway for more than

a minute.[6]  Although there appears to have been space in front of SORGENTE for him to move

---

[6] During this time, at approximately 4:25 p.m., at least two rioters were in medical distress and a
member of the crowd was pleading with officers and others for help, as his friend was dying after

into, as depicted below, SORGENTE, with his back to the officers, leaned back and pushed his weight into the officers.



---

being trampled by the mob. SORGENTE, apparently in response, yelled "Get her up. Get her up, please. Save her life. Save her life."

21



c.      By approximately 4:26 p.m., officers succeeded in pushing SORGENTE out of the Archway. SORGENTE, holding a strobing flashlight, stumbled, then got up, rinsed his eyes with water, and walked away from the Archway.

**6.      4:46 p.m.**

21.     Based on my review of BWC footage, U.S. Capitol surveillance video, and other publicly available video, I have observed the following:

a.      At approximately 4:46 p.m., SORGENTE returned to the Archway and positioned himself at the middle of the Archway, as depicted below:

22



b.      Rioters positioned in front of SORGENTE, closer to the line of police officers in the Archway, were holding riot shields, and began to slam the line of officers using those shields.

c.      After a few seconds, SORGENTE joined in by positioning himself behind one of the rioters holding a riot shield and propelling that rioter forward into the line of police officers, as depicted below:

23





## CONCLUSION

22.     Based on the foregoing, your Affiant submits that there is probable cause to believe that:

a.     KIM MICHAEL SORGENTE violated 18 U.S.C. § 1752(a)(1) and (2) (Restricted Building or Grounds), which makes it a crime to (1) knowingly enter or remain in any restricted building or grounds without lawful authority to do; and (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engage in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions. For purposes of Section 1752 of Title 18, a "restricted building" includes a posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service, including the Vice President, is or will be temporarily visiting; or any building or grounds so restricted in conjunction with an event designated as a special event of national significance.

b.     KIM MICHAEL SORGENTE violated 18 U.S.C. 231(a)(3), which makes it unlawful to commit or attempt to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function. For purposes of Section 231 of Title 18, a federally protected function means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of

the United States or by an officer or employee thereof. This includes the Joint Session of Congress where the Senate and House count Electoral College votes.

Kellie Martin
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 21st day of October 2021.

2021.10.21
16:21:31 -04'00'
_____
ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

26